1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                                DISTRICT OF OREGON

9                               PORTLAND DIVISION

10

11
JONATHAN HOLLANDER,                              No. 3:11-cv-01200-HU
12
            Plaintiff,                           **OPINION AND**
13                                               **ORDER**
       v.
14
RAINIER SCHOOL DISTRICT,
15
            Defendant.
16
—————————————————————————

17  Jonathan Hollander
    jehollander@gmail.com
18  5327 SE 77th Ave.
    Portland, OR 97206
19  Telephone: (503) 308-7056

20       Plaintiff Pro Se

21  Steven A. Kraemer
    sak@hartwagner.com
22  Leslie A. Edenhofer
    lae@hartwagner.com
23  HART WAGNER LLP
    1000 SW Broadway, Twentieth Floor
24  Portland, OR 97205
    Telephone: (503) 222-4499
25  Facsimile: (503) 222-2301

26       Attorneys for Defendant
         Rainier School District
27

28

Page 1 - OPINION AND ORDER

1  HUBEL, Magistrate Judge:

2      Plaintiff Jonathan Hollander ("Plaintiff"), father of two
3  children who attend public school in Rainier, Oregon, brings this
4  action against Defendant Rainier School District ("Defendant"),
5  alleging violations of 42 U.S.C. § 1983, the Fourteenth Amendment
6  and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794,
7  as well as state-law claims for defamation, and intentional and
8  negligent infliction of emotional distress.  Defendant moves to
9  dismiss Plaintiff's amended complaint pursuant to Federal Rule of
10 Civil Procedure ("Rule") 12(b)(1) for lack of subject matter
11 jurisdiction or, alternatively, under Rule 12(b)(6) for failure to
12 state a claim upon which relief can be granted.  For the reasons
13 that follow, Defendant's motion (Docket No. 31) to dismiss is
14 GRANTED in part and DENIED in part.

15                              **Facts**

16      These are the facts as recited in the amended complaint:
17 Plaintiff is a retired disabled Navy veteran and resident of
18 Rainier, Oregon whose children attend its public schools.  In
19 October 2009, Plaintiff noticed that Defendant removed his contact
20 information for his children from its computer system.  As a
21 result, Plaintiff would not receive pertinent information regarding
22 his children, nor was he able to attend school events "or play an
23 active role [in] the lives of his children[.]"  (FAC ¶ 5.)

24      On April 15, 2010, a county social worker inspected
25 Plaintiff's home based on a complaint from an unidentified employee
26 of Defendant.  The social worker had been informed that Plaintiff's
27 children no longer wanted to live with him because his residence
28 contained "huge piles of guns, and illegal drugs."  (FAC ¶ 6.)

Page 2 - OPINION AND ORDER

1  Ultimately, no guns or weapons were found, despite the fact that
2  Plaintiff allowed the social worker to go on a 30-minute, self-
3  guided tour of his home.

4      On October 28, 2010, Plaintiff joined one of his children for
5  their biweekly lunch at school.  At that time, Plaintiff's child
6  said she wanted to stay at his house, not her grandparent's house
7  (e.g., "a one bedroom, one bath cottage with 11 current
8  occupants"), because she "hadn't seen her mother in days" and was
9  being forced to sleep on the floor.  (FAC ¶ 8.)  Soon thereafter,
10  Plaintiff went to the administration office at the school and
11  filled out the appropriate paperwork in order for his child to be
12  transported to his residence after school.  Within ten minutes of
13  departing from the school, an administrator left Plaintiff a voice
14  mail indicating Plaintiff's ex-wife had been contacted and that
15  Plaintiff's request was being denied because Plaintiff "wasn't on
16  the emergency contact card," which meant that Plaintiff's daughter
17  would have to ride her "normal" school bus home.  (FAC ¶¶ 11, 14.)[1]
18  On other occasions, Plaintiff claims Defendant's employees "would
19  take the children home to stay with them," without Plaintiff's
20  knowledge or consent.  (FAC ¶ 16.)

21

22

23   [1] Presumably, the school administrator contacted Plaintiff's
     ex-wife first because she has custody of the children, whereas
24   Plaintiff is only permitted "specific days of visitation."  (FAC ¶
     16); see generally Ortiz v. Ortiz, 310 Or. 644, 649, 801 P.2d 767
25   (1990) (explaining that, "in the context of divorced persons,
     'custody' is the legal relationship between a minor child and the
26   legal custodian, i.e., the person to whom the court has given the
     primary rights and responsibilities to supervise, care for, and
27   educate the child; usually, that is the person with whom the child
     lives most of the time.") (emphasis added).

28

Page 3 - OPINION AND ORDER

1    On December 11, 2010, "after exhausting all known remedies,"
2  Plaintiff met with the superintendent of the school district,
3  Michael Carter, and explained "how the school staff had for years,
4  intentionally interfered [with his access to] his children, and
5  repeatedly ignored his parental rights."  (FAC ¶¶ 19-21.)  Mr.
6  Carter "verified that the court order gave [him] 100% access to his
7  children" during the meeting.  (FAC ¶ 21.)

8    On February 21, 2011, Plaintiff's oldest daughter returned
9  home from school with a pair of crutches, a knee brace, and a
10 bottle of Vicodin in her backpack.[2]  Neither the school district,
11 nor any school official contacted Plaintiff regarding his
12 daughter's injuries, even though she had to be taken to the
13 emergency room. Plaintiff attributes this to the fact that his
14 contact information was removed from Defendant's computer system.
15 In order to rectify the situation, Plaintiff went to the school
16 administration office and personally watched a school official type
17 his contact information into the computer.  Two days later, in late
18 February 2011, Plaintiff returned and asked another school official
19 to verify that his contact information had been entered. Much to
20 his dismay, the school official was not able to locate Plaintiff's
21 contact information in the computer database.

22    On July 7, 2011, Plaintiff was approached by his youngest
23 daughter's softball coach, who informed Plaintiff that "several
24 complaints had been filed by [Defendant's] employees alleging that
25 [P]laintiff was rowdy, vulgar, a danger to children, a threat to

26

27    [2] The amended complaint does not specify whether Plaintiff is
     referring to his home or his ex-wife's.

28

Page 4 - OPINION AND ORDER

other parents, and should be banned from attending all athletic events within the entire" school district. (FAC ¶ 29.) Although the softball coach did not echo these sentiments, he felt compelled to inform Plaintiff that he was "being watched by the director of [Defendant's] athletic department" and "casually pointed the man out" at the school-related sporting event. (FAC ¶ 29.)

Between July and September 2011, Plaintiff "received zero information from [Defendant] concerning his children and the upcoming school year" because his contact information was never reentered into the computer system. (FAC ¶ 29.) Based on Defendant's aforementioned actions, Plaintiff claims he "has suffered debilitating anxiety and severe depression" and "has been under the care of a physician for 2 years due to the mental anguish and incredible stress caused by the non-stop interference of [Defendant] into his family life, as well as the loss of years of companionship with his children." (FAC ¶¶ 31-32.)

Based on the foregoing actions taken by Defendant and its employees, Plaintiff claims that Defendant discriminated against him on the basis of his disability; however, nowhere does the amended complaint specify the nature of Plaintiff's disabilities other than to say they resulted from his military service. Likewise, there are no allegations that anyone at the school district had knowledge of the disabilities. The sole allegation about Plaintiff's disabilities is in paragraph 33 of the amended complaint, where Plaintiff alleges that his "military service, and the many disabilities caused by that service, were always used to propel the rumors of impending danger to [P]laintiff's children."

Page 5 - OPINION AND ORDER

1  (FAC ¶ 33.)  There is no allegation the "rumors" were "propelled"

2  by anyone at the school district pursuant to any policy or practice

3  of the District.

4  **Legal Standards**

5  **I.    Rule 12(b)(1) Motion to Dismiss**

6       Unlike a motion to dismiss for failure to state a claim, a

7  Rule 12(b)(1) motion to dismiss for lack of subject matter

8  jurisdiction

9       can attack the substance of a complaint's jurisdictional
       allegations despite their formal sufficiency, and in so
10      doing rely on affidavits or any other evidence properly
       before the court. . . . It then becomes necessary for the
11      party opposing the motion to present affidavits or any
       other evidence necessary to satisfy its burden of
12      establishing that the court, in fact, possesses subject
       matter jurisdiction.  The district court obviously does
13      not abuse its discretion by looking to this extra-
       pleading material in deciding the issue, even if it
14      becomes necessary to resolve factual disputes.

15  *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)

16  (internal citations omitted); *see also Kokkonen v. Guardian Life*

17  *Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are

18  courts of limited jurisdiction. . . . It is to be presumed that a

19  cause lies outside this limited jurisdiction, and the burden of

20  establishing the contrary rests upon the party asserting

21  jurisdiction.")

22  **II.   Rule 12(b)(6) Motion to Dismiss**

23       A court may dismiss a complaint for failure to state a claim

24  upon which relief can be granted pursuant to Rule 12(b)(6).  In

25  considering a Rule 12(b)(6) motion to dismiss, the court must

26  accept all of the claimant's material factual allegations as true

27  and view all facts in the light most favorable to the claimant.

28

Page 6 - OPINION AND ORDER

1   *Reynolds v. Giusto*, No. 08-CV-6261, 2009 WL 2523727, at *1 (D. Or.
2   Aug. 18, 2009).   The Supreme Court addressed the proper pleading
3   standard under Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*, 550
4   U.S. 544 (2007).   *Twombly* established the need to include facts
5   sufficient in the pleadings to give proper notice of the claim and
6   its basis: "While a complaint attacked [under] Rule 12(b)(6) . . .
7   does not need detailed factual allegations, a plaintiff's
8   obligation to provide the grounds of his entitlement to relief
9   requires more than labels and conclusions, and a formulaic
10  recitation of the elements of a cause of action will not do." *Id*.
11  at 555 (brackets omitted).

12      Since *Twombly*, the Supreme Court has clarified that the
13  pleading standard announced therein is generally applicable to
14  cases governed by the Rules, not only to those cases involving
15  antitrust allegations.   *Ashcroft v. Iqbal*,---U.S.---, 129 S. Ct.
16  1937, 1949 (2009).   The *Iqbal* court explained that *Twombly* was
17  guided by two specific principles.   First, although the court must
18  accept as true all facts asserted in a pleading, it need not accept
19  as true any legal conclusion set forth in a pleading.   *Id*.   Second,
20  the complaint must set forth facts supporting a plausible claim for
21  relief and not merely a possible claim for relief.   *Id*.   The court
22  instructed that "[d]etermining whether a complaint states a
23  plausible claim for relief will . . . be a context-specific task
24  that requires the reviewing court to draw on its judicial
25  experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50 (citing
26  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).   The court
27  concluded: "While legal conclusions can provide the framework of a
28

Page 7 - OPINION AND ORDER

1  complaint, they must be supported by factual allegations.   When
2  there are well-pleaded factual allegations, a court should assume
3  their veracity and then determine whether they plausibly give rise
4  to an entitlement to relief." *Id*. at 1950.

5       The Ninth Circuit further explained the *Twombly-Iqbal* standard
6  in *Moss v. U.S. Secret Service*, 572 F.3d 962 (9th Cir. 2009).  The
7  *Moss* court reaffirmed the *Iqbal* holding that a "claim has facial
8  plausibility when the plaintiff pleads factual content that allows
9  the court to draw the reasonable inference that the defendant is
10 liable for the misconduct alleged." *Moss*, 572 F.3d at 969 (quoting
11 *Iqbal*, 129 S. Ct. at 1949).   The court in *Moss* concluded by
12 stating: "In sum, for a complaint to survive a motion to dismiss,
13 the non-conclusory factual content, and reasonable inference from
14 that content must be plausibly suggestive of a claim entitling the
15 plaintiff to relief." *Moss*, 572 F.3d at 969.

16                              **Analysis**
17 **I.   The Domestic Relations Exception**

18      Defendant argues that this case should be dismissed for lack
19 of subject matter jurisdiction because it falls within the domestic
20 relations exception to federal jurisdiction.

21      Long ago the Supreme Court recognized that, when the relief
22 sought relates primarily to domestic relations, a doctrine referred
23 to as the domestic relations exception divests federal courts of
24 jurisdiction. *See, e.g., In re Burrus*, 136 U.S. 586, 593-94
25 (1890). As the Court more recently explained, "[s]o strong is our
26 deference to state law in this area that we have recognized a
27 domestic relations exception that divests the federal courts of
28

Page 8 - OPINION AND ORDER

1  power to issue divorce, alimony, and child custody decrees." *Elk*
2  *Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12-13 (2004)
3  (citation and internal quotation marks omitted).

4       Defendant relies almost exclusively on *Coats v. Woods*, 819
5  F.2d 236 (9th Cir. 1987), in support of its position that the
6  domestic relations exception applies here.   In *Coats*, the
7  plaintiff-mother brought an action under § 1983, alleging that her
8  husband and others, including the Newport-Mesa School District,
9  wrongfully deprived her of the custody of her two children.  *Id.* at
10 236-37.  At the time appeal was taken, the plaintiff also had two
11 cases pending in state court; one involving the constitutional
12 issues raised in the federal action and another focusing on state-
13 law custody matters.   *Id.* at 237.   In affirming the district
14 court's dismissal, the Ninth Circuit stated:

15       [F]ederal courts traditionally decline to exercise
         jurisdiction in domestic relations cases when the core
16       issue involves the status of parent and child or husband
         and wife. . . .
17
              . . . .
18
19       This case, while raising constitutional issues, is
         at its core a child custody dispute.  The state courts
20       have already considered the merits of [the plaintiff's]
         claims and have held that her former husband is entitled
21       to custody.  The district court was aptly reluctant to
         put itself in the position of having to review the state
22       courts' custody decision.  If the constitutional claims
         in the case have independent merit, the state courts are
23       competent to hear them.  Given the state courts' strong
         interest in domestic relations, we do not consider that
24       the district court abused its discretion when it invoked
         the doctrine of abstention.

25 *Id.*

26      In the court's view, and contrary to Defendant's position,
27 *Coats* did not rely on the domestic relations exception in affirming
28

Page 9 - OPINION AND ORDER

1  the dismissal of an action brought pursuant to § 1983.  Rather,
2  *Coats'* holding appears to be grounded on the abstention principles
3  established in *Younger v. Harris*, 401 U.S. 37 (1971).  *Compare*
4  *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799
5  (9th Cir. 2001) ("*Younger* abstention is required if the state
6  proceedings are (1) ongoing, (2) implicate important state
7  interests, and (3) provide the plaintiff an adequate opportunity to
8  litigate federal claims")*, with Coats*, 819 F.2d at 237 (concluding
9  that "[t]he district court's application of the abstention doctrine
10 was appropriate under*" Peterson v. Babbitt,* 708 F.2d 465 (9th Cir.
11 1983), wherein the court "affirmed the district court's dismissal
12 of [a § 1983] case on the ground that plaintiff had pending state
13 actions in which he could bring his constitutional claims and that
14 the case itself raised issues of traditional state concern"), *and*
15 *United States v. Bailey*, 115 F.3d 1222, 1231 (5th Cir. 1997) ("The
16 domestic relations exception . . . has no application where . . .
17 there exists an independent basis for federal jurisdiction.")

18      Unlike *Coats*, there is no allegation in this case by Defendant
19 of any pending state proceeding.  *See generally Ankenbrandt v.*
20 *Richards*, 504 U.S. 689, 705 (1992) ("[W]e have never applied the
21 notions of comity so critical to *Younger's* 'Our Federalism' when no
22 state proceeding was pending . . . .")  Rather, as Defendant points
23 out, Plaintiff merely "refers to court orders regarding child
24 custody in his Amended Complaint as well as alleged discussions
25 with his ex-wife regarding child custody." (Def.'s Mem. Supp. at
26 3.)

27
28

Page 10 - OPINION AND ORDER

1        In any event, Defendant's reliance on the domestic relations
2   exception is particularly dubious in light of the Ninth Circuit's
3   decision in *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d
4   943 (9th Cir. 2008).  *Atwood* involved a custody dispute concerning
5   an Indian child.  *Id.* at 945.  The child's non-Indian father
6   brought an action in federal court challenging the jurisdiction of
7   the Fort Peck Tribal Court that granted temporary custody to the
8   child's maternal grandmother.  *Id.*  The district court dismissed
9   the case, relying on the domestic relations exception to subject
10  matter jurisdiction.  *Id.*  On appeal, *Atwood* held "that the
11  domestic relations exception, a doctrine divesting the federal
12  courts of jurisdiction, applies only to the diversity jurisdiction
13  statute, 28 U.S.C. § 1332, and that the district court erred by
14  applying the domestic relations exception because federal question
15  jurisdiction exists in th[at] case under 28 U.S.C. § 1331."  *Id.*

16       "It is most true that this Court will not take jurisdiction if
17  it should not: but it is equally true, that it must take
18  jurisdiction if it should. . . . [The Court has] no more right to
19  decline the exercise of jurisdiction which is given, than to usurp
20  that which is not given."  *Marshall v. Marshall*, 547 U.S. 293, 298-
21  99 (2006) (citation omitted).  As in *Atwood*, Plaintiff's § 1983
22  claim(s) and Rehabilitation Act claims present a clear basis for
23  federal question jurisdiction under § 1331, thereby rendering the
24  domestic relations exception inapplicable.  *See Brown v. Astrue*,
25  No. 10-cv-04826, 2012 WL 948926, at *3 (N.D. Cal. Mar. 20, 2012)
26  ("As this case arises under the federal question jurisdiction
27  statute, the domestic-relations exception has no application
28

Page 11 - OPINION AND ORDER

1    here.")   Accordingly,  Defendant's motion to dismiss is denied on
2    this ground.

3    **II.   Failure to State a Claim**

4        Defendant  moves  to  dismiss  each  of  Plaintiff's  claims  as
5    presented in his  first amended complaint.  I will  address these
6    contentions in turn.

7        **A.    Rehabilitation Act Claims**

8        Section 504 of the Rehabilitation Act provides in relevant
9    part: "No otherwise qualified individual with a disability in the
10   United  States  .  .  .  shall,  solely  by  reason  of  her  or  his
11   disability, be excluded from the participation in, be denied the
12   benefits of, or be subjected to discrimination under any program or
13   activity receiving Federal financial assistance . . . ." 29 U.S.C.
14   § 794(a).  "Section 504 applies to all public schools that receive
15   federal financial assistance." *Mark H. v. Lemahieu*, 513 F.3d 922,
16   929 (9th Cir. 2008).

17       To make out a prima facie case of disability discrimination
18   under the Rehabilitation Act, Plaintiff must show that: (1) he is
19   handicapped within the meaning of the Rehabilitation Act; (2) he is
20   otherwise qualified for the benefit or services sought; (3) he was
21   denied the benefit or services "solely by reason of" his handicap;
22   and (4) the program providing the benefit or services receives
23   federal financial assistance.  *Lovell v. Chandler*, 303 F.3d 1039,
24   1052 (9th Cir. 2002).

25       Defendant argues that counts one and two of Plaintiff's
26   amended complaint, both of which are styled as claims under § 504
27   of the  Rehabilitation  Act,  should  be  dismissed.    Defendant's
28

Page 12 - OPINION AND ORDER

1  argument is twofold: first, Defendant argues that the amended
2  complaint fails to specify the benefit or program from which
3  Plaintiff was allegedly excluded; second, Defendant argues that
4  Plaintiff fails to allege sufficient facts to support the
5  conclusion that any exclusion was solely by reason of Plaintiff's
6  alleged disability.

7       The Seventh Circuit addressed similar arguments in *Grzan v.*
8  *Charter Hospital of Northwest Indiana*, 104 F.3d 116 (7th Cir.
9  1997).  There, the plaintiff brought a Rehabilitation Act claim
10 against the hospital where she was admitted as a psychiatric
11 patient.  *Id.* at 118.  The crux of the plaintiff's claim was that
12 "she received poor treatment, defective treatment, and thereby
13 different and unequal treatment from the hospital" based on "the
14 actions of a counselor who, because she suffered from diagnosed
15 depression, personality disorder, and posttraumatic stress
16 disorder, was able to entice her into entering into a sexual
17 relationship to the detriment of her psychiatric recovery." *Id.* at
18 121.  On appeal, the hospital argued that the plaintiff failed to
19 allege two elements of a prima facie case of disability
20 discrimination under the Rehabilitation Act: "(1) that she was
21 'otherwise qualified,' and (2) that she received discriminatory
22 treatment solely because of her handicap." *Id.* at 120.  In
23 affirming the district court's dismissal of the action, the Seventh
24 Circuit agreed that the plaintiff could not satisfy the "solely by
25 reason of" disability element, emphasizing that § 504 "does not
26 cover discrimination among similarly handicapped persons.  The word
27 solely provides the key: the discrimination must come from the
28

Page 13 - OPINION AND ORDER

1  handicap and from the handicap alone.  If others with the same
2  handicap do not suffer the discrimination, then the discrimination
3  does not result 'solely by reason of [the] handicap.'"  *Id.* at 121
4  (quoting *Johnson by Johnson v. Thompson*, 971 F.2d 1487, 1493-94
5  (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993)).

6       The decision in *Ward v. Kaiser Foundation Hospital*, No. C-06-
7  2645, 2006 WL 2529479 (N.D. Cal. Aug. 31, 2006), also turned on the
8  "solely by reason of" disability element.  There, the plaintiff-
9  doctor brought a Rehabilitation Act claim against the defendant-
10 hospital, alleging that he was denied certain hospital privileges
11 based on his past history of alcohol dependency and voluntary
12 participation in an extended program of alcohol rehabilitation. *Id.*
13 at *1.  The defendant moved to dismiss, arguing that the "solely by
14 reason of" disability element was not met because the plaintiff
15 alleged in his complaint that the decision to deny hospital
16 privileges was based "largely" upon his history of alcohol
17 dependency, as opposed to solely.  *Id.* at *4.  *Ward* disagreed and
18 concluded that the plaintiff's allegations were sufficient to
19 permit an inference that he was denied hospital privileges solely
20 on the basis of his alcoholism.  *Id.*  In so holding, *Ward*
21 emphasized that the plaintiff did "not allege any specific facts
22 indicating that the [d]efendant had a mixed motive" which would
23 have precluded such a finding.  *Id.*[3]

24

25     [3] Although the court finds *Ward's* "mixed motive" analysis
26 instructive, as discussed further below, it also notes that the
   *Ward* decision predated *Twombly* and *Iqbal*.  It is questionable
27 whether an allegation that one was discriminated against based
   "largely" upon his or her disability would survive under the more
28

Page 14 - OPINION AND ORDER

1   In this case, even accepting as true all of Plaintiff's
2 factual allegations and drawing all reasonable inferences in his
3 favor, the court is still compelled to find that Plaintiff failed
4 to state a claim under § 504 of the Rehabilitation Act.   Nowhere
5 does the amended complaint allege what Plaintiff's disabilities
6 are.   There is no clear allegation anyone employed by Defendant
7 knew of the disabilities.  *Cf. Bezi v. Camacho*, No. 11-0677, 2012
8 WL 5519386, at *19 (C.D. Cal. Sept. 27, 2012) (dismissing
9 Rehabilitation Act claim since the plaintiff "failed to
10 *sufficiently* allege that defendants knew that she was disabled.")
11 (emphasis added); *Boldin v. Wingfield*, No. 6:10-cv-00010, 2010 WL
12 3766325, at *3 (W.D. Va. Sept. 16, 2010) (dismissing pro se
13 litigant's Rehabilitation Act claim because she failed to allege
14 "some nexus" between the accommodation sought and her disability),
15 *aff'd*, 403 Fed. Appx. 830 (4th Cir. 2010).

16   Paragraph 33 of the amended complaint does fairly allege that
17 Plaintiff's service-related disabilities, whatever they are, "were
18 always used to propel the rumors of impending danger to
19 [P]laintiff's children."   (FAC ¶ 33.)   There are no allegations
20 that anyone employed by Defendant "propelled" these rumors.   Nor
21 are there any allegations that the differences in the manner in
22 which Defendant dealt with Plaintiff, as compared to other parents
23 Plaintiff refers to in paragraphs 23 and 24, were solely due or
24 indeed due at all to Plaintiff's disabilities.   I also note there
25 are no allegations that the other unidentified parents in

26

27 stringent *Twombly/ Iqbal* pleading requirements.

28

Page 15 - OPINION AND ORDER

paragraphs 23 and 24 were or were not disabled themselves. For these reasons, Defendant's motion to dismiss Plaintiff's Rehabilitation Act claims is granted. However, while it is difficult to see how Plaintiff could develop proof of such allegations if he were to amend and attempt to allege, on a good faith basis, sufficient facts to avoid a motion to dismiss, as a pro se, he deserves the opportunity to do so having been advised here of the deficiencies of his current amended complaint. Plaintiff has thirty (30) days from the entry of this order to file a second amended complaint curing these problems if he can do so in good faith, consistent with Rule 11(b).

**B.    Section 1983 Claim(s)**

In order to establish a § 1983 claim, "a plaintiff must show that an individual acting under the color of state law deprived him of a right, privilege, or immunity protected by the United States Constitution or federal law." *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008). It is well settled that the term "person" includes municipalities. *Monell v. Dep't of Soc. Serv. of N.Y.*, 436 U.S. 658, 694 (1978). Liability may attach to a municipality, such as a school district, "if the plaintiff can show that an authorized final policy-maker undertook or ratified unconstitutional action, or that a district employee violated constitutional rights pursuant to an expressly adopted official policy or a longstanding practice or custom." *Zandberg v. Edmonds High School Dist.*, No. C08-0570-JCC, 2009 WL 973348, at *6 (W.D. Wash. Apr. 9, 2009), *aff'd*, 378 Fed. Appx. 714 (9th Cir. 2010).

Page 16 - OPINION AND ORDER

1    Plaintiff's § 1983 claim appears to be premised primarily on
2  his allegation that Defendant interfered with his Fourteenth
3  Amendment right to familial association.    Parents have "a
4  fundamental liberty interest in the companionship and society of
5  his or her child and . . . the state's interference with that
6  liberty interest without due process of law is remediable under [§]
7  1983." *Crowe v. County of San Diego*, 608 F.3d 406, 441 (9th Cir.
8  2010); *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir.
9  2011) (per curiam) ("The substantive due process right to family
10 integrity or to familial association is well established.    A parent
11 has a 'fundamental liberty interest' in companionship with his or
12 her child.")    This liberty interest is not reserved for parents
13 with full legal and physical custody; rather, it extends to parents
14 with no legal or physical custody, but merely visitation rights,
15 "even though such a parent's right is unambiguously lesser in
16 magnitude than that of a parent with full legal custody." *James v.*
17 *Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010) (citation and internal
18 quotation marks omitted).    Plaintiff therefore has a protected
19 liberty interest in the companionship and society of his children
20 regardless of the extent to which he does or does not have legal or
21 physical custody.

22    Defendant asserts that the standard for deprivation of the
23 substantive due process right to familial companionship is conduct
24 which "shocks the conscience."    It appears the Ninth Circuit cases
25 on this point are inconsistent, an observation echoed by the
26 district court in *Palmer v. Arizona*, No. 2:09-cv-01791, 2012 WL
27 1648404, at *5 (D. Ariz. May 10, 2012).    For example, in *Crowe*, the
28

Page 17 - OPINION AND ORDER

1  Ninth Circuit said there was "no support in the relevant case law"
2  for the assertion that the correct standard is whether the § 1983
3  defendant's conduct "shocked the conscience," choosing instead to
4  apply an "unwarranted interference" standard.  *Crowe*, 608 F.3d at
5  441 n.23 (citation omitted).  Nearly a year and a half later, in
6  *Rosenbaum*, the Ninth Circuit cited the Supreme Court's decision in
7  *Richin v. California*, 342 U.S. 165, 172-73 (1952), for the
8  proposition that the harmful conduct must "shock the conscience" or
9  "offend the community's sense of fair play and decency" in order to
10  amount to a violation of substantive due process.  *Rosenbaum*, 663
11  F.3d at 1079.  As in *Palmer*, this court will apply the standard
12  enunciated in the per curiam opinion in *Rosenbaum*.

13      *Rosenbaum* provided two examples of cases where the plaintiff
14  stated a plausible claim under § 1983 for violation of the
15  substantive due process right to family integrity: *Lee v. City of*
16  *Los Angeles*, 250 F.3d 668, 685-86 (9th Cir. 2001) (plaintiff-
17  mother's "mentally disabled son was mistaken for another person,
18  falsely arrested, caused to be extradited to New York from
19  California, and imprisoned; the police department misinformed her
20  of his whereabouts on several occasions until he was finally
21  released two years later"), and *Kelson v. City of Springfield*, 767
22  F.2d 651, 653-55 (9th Cir. 1985) ("parents . . . stated a cause of
23  action for a violation of their right to companionship and society
24  of a child where their teenage son had committed suicide at
25  school.")  *Rosenbaum*, 663 F.3d at 1079.

26      By contrast, the *Rosenbaum* court concluded, at the summary
27  judgment stage, that the facts of that case did "not come close to
28

Page 18 - OPINION AND ORDER

rising the level of conduct that 'shocks the conscience.'" *Id.* The record in *Rosenbaum* indicated that Herschel Rosenbaum was approached by police officers as he stood outside a fair selling free promotional tickets that he had received from a radio station. *Id.* at 1073.  The officers arrested Mr. Rosenbaum—who was wearing a t-shirt with the radio station's logo and had his two children standing beside him—for abuse, neglect or endangerment of a child, and obtaining money under false pretenses. *Id.*  While escorting the children across the street to the car where their mother was waiting, the officers told the children their father was going to jail because what he did "was wrong." *Id.*  Although Mr. Rosenbaum spent eights hours in jail, the charges were ultimately dropped since there was no scalping law in Nevada and no other charge applied to his conduct. *Id.* at 1073-74.  In concluding that the Rosenbaums' substantive due process right to family integrity was not violated, the Ninth Circuit distinguished *Lee* and *Kelson*, stating:

> Unlike *Lee* or *Kelson*, Rosenbaum was not separated from his children for any extended period of time; rather, the children were walked across the street to their mother who was waiting in their car. It is true that [the arresting officer] -- and perhaps other officers' -- words to the children were inappropriate and even offensive.  The children's father had not in fact done anything 'wrong' and [the arresting officer] likely exacerbated an already traumatic experience for this four year old and eight year old.  And yet we do not hold that the inappropriate conduct amounts to a constitutional violation.
>
> . . . [I]n this instance, the officers' conduct does not 'shock the conscience.'

*Id.* at 1079-80.

Page 19 - OPINION AND ORDER

Accepting Plaintiff's factual allegations in paragraphs 3-14, 16-22 and 26-27 as true, which I must do at this stage, Plaintiff has alleged a plausible substantive due process claim. It is clear Plaintiff has a liberty interest at stake here, and the proof at trial or summary judgment will ultimately determine whether the alleged deprivation of that interest rises to the level of a federal constitutional violation. Whether facts develop to support a "shocks the conscience" standard or something that no reasonable juror would be shocked by must await discovery.

Plaintiff does not clearly allege a claim he was deprived of a federal constitutional right to participate in his children's education. Plaintiff's allegations of Defendant's failure to provide him with information pertaining to his children's education, notice of school-related events, and other notices apparently routinely given to parents, (FAC ¶¶ 5, 25, 28, 30-31, 37, 39), seem to suggest Plaintiff is pursuing such a claim. If Plaintiff intends to allege a claim for unconstitutional denial of his participation in his children's education, the court directs his attention to the most closely analogous federal decision on this issue: *Crowley v. McKinney*, 400 F.3d 965 (7th Cir. 2005), *cert. denied*, 546 U.S. 1033 (2005).[4]

There, a noncustodial father, Daniel Crowley, appealed the dismissal of his § 1983 suit against the principal of his children's school, and the school district itself. *Crowley*, 400 F.3d at 967. Although the mother had custody of the children, the

---

[4] Research did not reveal any cases from the Ninth Circuit addressing similar allegations.

Page 20 - OPINION AND ORDER

divorce decree provided Crowley with equal access to education records and required the parents to "direct the children's school authorities to promptly advise each of them of the children's grades and progress in school and of all school meetings, functions and activities that are open to attendance by parents." *Id.* Crowley had long been critical of the school's principal and superintendent, and complained to them about his son being bullied and about the school's failure to provide him "with notices, records, correspondence and other documents that custodial parents receive." *Id.* As a result, Crowley claimed he had to "rely on his children telling him about matters such as upcoming school events or injuries suffered at school, and only hear[d] about incidents such as a gun being brought to Hiawatha School through third parties." *Id.* Crowley unsuccessfully attempted to remedy the problems by providing the school with 100 self-addressed envelopes for correspondence and volunteering to be a playground monitor. *Id.* In two unrelated incidents, the school also refused to tell Crowley whether his son was at school that day and forbade him to attend a book fair. *Id.* at 968.

On appeal, the claim that Crowley "presse[d] hardest" was that the school interfered with his substantive due process right to participate in his children's education. *Id.* In dissecting the constitutional viability of such a claim, Judge Posner made several observations that apply in the present case:

> It is difficult for a school to accommodate the demands of parents when they are divorced. The school does not know what rights each of the parents has. It knows which parent has custody, because that parent's address is the student's address, but unless it consults

the divorce decree it won't know what rights the other parent has. And since physical and legal custody are different the school will not even know whether the parent with whom the child lives has joint or, as here, sole custody.

These difficulties are compounded by the scope of the federal constitutional right that Crowley is claiming. It is one thing to say that parents have a right to enroll their children in a private school that will retain a degree of autonomy and thus be free to teach a foreign language, or evolution, or human sexual biology, without prohibition by the state. It is another thing to say that they have a constitutional right to school records, or to be playground monitors, or to attend school functions. Schools have valid interests in limiting the parental presence -- as, indeed, do children, who in our society are not supposed to be the slaves of their parents. . . .

Federal judges are ill equipped by training or experience to draw the line in the right place, and litigation over where to draw it would be bound to interfere with the educational mission. It would do so not only by increasing schools' legal fees but also and more ominously by making school administrators and teachers timid because fearful of being entangled in suits by wrathful parents rebuffed in their efforts to superintend their children's education. Interests of constitutional weight and dignity are on both sides of the ledger because academic freedom, which is an aspect of freedom of speech, includes the interest of educational institutions, public as well as private, in controlling their own destiny and thus in freedom from intrusive judicial regulation. . . .

The intrusion on public education to which Crowley is inviting the federal judiciary is magnified when the right of participation in a child's public-school education is claimed by a noncustodial parent. . . . It does not follow that a public school is to be charged with knowledge of the contents of the divorce decrees of its students' divorced parents or that it must allow itself to be dragged into fights between such parents . . . .

*Id.* at 969-70 (internal citations omitted).

After expressing great doubt as to whether Crowley had a federal constitutional right to participate in his children's education at the level of detail claimed, Judge Posner affirmed the

Page 22 - OPINION AND ORDER

district court's dismissal of Crowley's substantive due process claim, stating:

> [T]he complaint makes clear that the [superintendent]'s (and hence the school district's) participation in [the principal]'s acts was limited to not doing anything about them [despite being the policymaker for the school district and having knowledge of the acts of which Crowley complains].   Inaction by a public agency is insufficient participation in a subordinate's misconduct to make the agency liable in a suit under 42 U.S.C. § 1983 unless the policymaking level at the agency has deliberately decided to take no action against, and thus in effect to condone, to ratify, the misconduct and so adopt it as the agency's (unofficial) policy.   And that is not alleged.

*Id.* at 971-72 (citing *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir. 2004)).

Here, Plaintiff alleges that he "brought all of his concerns directly to the attention" of the school superintendent, Michael Carter, in December 2010.  (FAC ¶ 19.)   Initially, on December 7, 2010, Plaintiff sent Mr. Carter an email "about the constant behavior of the administrative staff (as well as several teachers), constantly interfering with [P]laintiff's legal right to be a participating parent in the life of his children."  (FAC ¶ 20.) Four days later, Plaintiff met with Mr. Carter and explained how "school staff had for years, intentionally interfered in accessing his children, and repeatedly ignored his parental rights."  (FAC ¶ 22.)   Plaintiff does not allege that Mr. Carter took any action to rectify the situation, nor does he allege that Mr. Carter "deliberately decided to take no action against, and thus in effect to condone, to ratify, the misconduct and so adopt it as . . . [Defendant]'s (unofficial) policy."  *Crowley*, 400 F.3d at 971-72. The only defendant is the school district and under *Monell*, 436

Page 23 - OPINION AND ORDER

1  U.S. at 694, Plaintiff must show that "(1) [Defendant] acted under

2  color of state law, and (2) if a constitutional violation occurred,

3  [that] the violation was caused by an official policy or custom of

4  [Defendant]." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139

5  (9th Cir. 2012).  If Plaintiff intends to allege that Defendant's

6  deprived him of a constitutional right to participate in his

7  children's educations, he has failed to allege a factual basis to

8  support that claim.

9      C.  **Supplemental Jurisdiction**

10     Pursuant to 28 U.S.C. § 1367, "when a district court dismisses

11  on the merits . . . federal claim[s] over which it ha[s] original

12  jurisdiction, it may then decline to exercise supplemental

13  jurisdiction over the remaining state claims, subject to the

14  factors set forth in § 1367(c)(1)-(4)." *Herman Family Revocable*

15  *Trust v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001).  The

16  court's discretionary authority under § 1367(c) can be invoked by

17  a party asking for dismissal of state-law claims or on the court's

18  own initiative. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001

19  n.3 (9th Cir. 1997) (en banc).  However, federal courts "have no

20  *sua sponte* obligation to ensure that the discretionary retention of

21  supplemental jurisdiction, to which no one has objected, [is]

22  prudent." *Id.* at 1001.

23     In this case, the court is not required to conduct a § 1367(c)

24  analysis because Defendant has not objected to the court's

25  retention of supplemental jurisdiction over Plaintiff's remaining

26  state-law claims for defamation, and intentional and negligent

27  infliction of emotional distress.  Nevertheless, because there is

28

Page 24 - OPINION AND ORDER

1  authority for the proposition that balance of factors under §
2  1367(c)(1)-(4) weigh in favor of a federal decision on the merits
3  where it is clear how the supplemental claims can be decided, *see*
4  *Timm v. Mead Corp*, 32 F.3d 273 (7th Cir. 1994), and because
5  Plaintiff might be able to amend his federal claims and cure the
6  deficiencies described, the court will retain jurisdiction of
7  Plaintiff's state-law claims.

8       Defendant argues that Plaintiff's remaining state-law tort
9  claims should be dismissed because Plaintiff does not allege that
10 he filed the tort claims notice required under ORS 30.275(2)(b).
11 The Oregon Tort Claims Act ("OTCA") is "the exclusive remedy for
12 pursuing a tort claim against a public body or claims against
13 public employees acting with the course and scope of their
14 employment." *Gonzales v. Deschutes County*, No. 09-932-CL, 2011 WL
15 4501053, at *3 (D. Or. Sept. 28, 2011).  The OTCA requires notice
16 within 180 days of the alleged loss or injury. OR. REV. STAT. §
17 30.275(2)(b). "Proof of giving the required notice is an essential
18 element of a plaintiff's case-in-chief," *Vineyard v. Soto.*, No.
19 10-1481-AC, 2011 WL 3705001, at *4 (D. Or. July 21, 2011), and
20 complaints that fail to allege that notice was given in accordance
21 with the OTCA are subject to dismissal. *Brinkley v. Oregon Health*
22 *Scis. Univ.*, 94 Or. App. 531, 537 (1988), *rev. denied*, 307 Or 571
23 (1989).

24      Nothing in Plaintiff's amended complaint indicates that he has
25 complied with the OTCA's notice requirement.  Accordingly,
26 Plaintiff's state-law claims for defamation, and intentional and
27 negligent infliction of emotional distress are dismissed, but with
28

Page 25 - OPINION AND ORDER

1   leave to amend if he can in good faith allege timely tort claim
2   notice. *See* Fᴇᴅ. R. Cɪᴠ. P. 11(b).

3                                **Conclusion**

4       For the reasons stated, Defendant's motion (Docket No. 31) to
5   dismiss is GRANTED in part and DENIED in part.  The motion is
6   GRANTED in part and DENIED in part with respect to Plaintiff's
7   federal claims, and GRANTED in its entirety with respect to
8   Plaintiff's state-law tort claims.  The motion is DENIED to the
9   extent Defendant argues that this court lacks subject matter
10  jurisdiction.  Plaintiff is granted leave to amend to the extent
11  that he, in good faith, and consistent with Rule 11(b), can allege
12  claims that otherwise cure the deficiencies described above.
13  Plaintiff has thirty (30) days from the date of this Order to file
14  a second amended complaint.  In the event Plaintiff fails to timely
15  amend his pleadings, all claims alleged against Defendant will be
16  deemed dismissed with prejudice.

17      IT IS SO ORDERED.

18      Dated this _22nd___ day of March, 2013.

19                          /s/ Dennis J. Hubel

20                    _____
                              DENNIS J. HUBEL
21                      United States Magistrate Judge

22

23

24

25

26

27

28

Page 26 - OPINION AND ORDER